## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **ADRIAN GHIOROAIE-PANAIT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. 3:17-cv-00698-ALB-WC** |
| | ) |
| **HENRY ROLLE,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adrian Ghioroaie-Panait ("Ghioroaie") filed this action against (1) Auburn University,[1] his former employer, asserting discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (2) Ralph Spry, the head coach of the Auburn University Track and Field Program ("track team"), asserting a negligent training and supervision claim under Alabama law; and (3) Henry Rolle, an assistant coach of the track team, asserting assault and battery claims under Alabama law. This matter comes before the Court on Defendant Auburn University's Motion for Summary Judgment (Doc. 62) and

---

[1] In his original Complaint, Plaintiff incorrectly named the Board of Trustees of Auburn University as a defendant. *See* Doc. 1. Plaintiff later filed an Amended Complaint, naming Auburn University as the proper party defendant. *See* Doc. 21.

Defendant Ralph Spry's Motion for Summary Judgment. (Doc. 63). For the reasons stated below, the motions are due to be granted.

## BACKGROUND

Ralph Spry, who is a black American, is the head coach of the track team and has been employed by Auburn since the late 1990s. In December 2013, Auburn hired Ghioroaie, a white Romanian, as an assistant coach of the track team. Ghioroaie served as the horizontal jump coach and coached some multi-events. During his employment at Auburn, Ghioroaie was one of five assistant coaches for the track team. The other assistant coaches were Scott Richardson (white, American); Mark Carroll (white, Irish); Knut Hjeltnes (white, Norwegian); and Henry Rolle (black, Bahamian). Spry reported to Bernard Hill, a Senior Associate Athletics Director and sports administrator to the track team, who reported to then-Athletic Director Jay Jacobs.

Rolle, who was hired by Auburn in 2001, was the assistant head coach of the track team. Though Rolle was occasionally in charge in Spry's absence, the assistant coaches reported directly to Spry, and Rolle did not otherwise have any supervisory authority.

The assistant coaches for the track team sign one-year contracts, which may be renewed on a continuing one-year basis at Spry's discretion. Ghioroaie's

employment contract was renewed in 2014 and 2015, but Spry decided not to renew Ghioroaie's contract in 2016.

## I.   Ghioroaie's Employment with Auburn

According to Auburn, during Ghioroaie's time as an assistant coach, he (1) demonstrated an inability to get along with the rest of the coaching staff, his student-athletes, professional athletes, high school and/or club coaches, and SEC officials, (2) was insubordinate to Spry, and (3) committed multiple NCAA violations. Ghioroaie disputes Auburn's characterization—not necessarily the underlying facts—of many of the events that took place during his employment.

Ghioroaie's first verbal disagreement with Rolle occurred in March or April 2014 when he and Rolle had a disagreement regarding the team's travel to Atlanta for a track meet. According to Ghioroaie, Rolle became angry in a staff meeting after the competition and stood over Ghioroaie, making comments like "[w]here I come from, we have ways of dealing with someone like you." Ghioroaie did not report this incident to Human Resources.

A few months later in 2014, Ghioroaie's contract was extended from August 1, 2014, until July 31, 2015. [2]

---

[2] Ghioroaie's initial contract with Auburn was from December 9, 2013, through July 31, 2014, because he began his employment during the middle of the Athletic Department's fiscal year.

Ghioroaie was cited for an NCAA violation on April 23, 2015, for improperly texting a recruit. He served a two-week recruiting penalty for the violation.

On May 16, 2015, Ghioroaie was involved in a heated argument with an SEC official at the outdoor championships. After receiving what he deemed a bad call from the official, Ghioroaie yelled at the official at the event site and followed the official into the hospitality area, continuing to yell at the official. Though Ghioroaie was not formally reprimanded by Spry after this incident, Spry verbally discussed the incident with Ghioroaie.

Less than a week later on May 22, 2015, Ghioroaie got into an argument with Donald Thomas, a professional athlete who had permission to use Auburn's track facilities for training. According to Ghioroaie, Thomas disrespected him and disregarded his position and told Ghioroaie that he was not going to "recommend[] Auburn to any jumpers that ask any recommendations to come here since you have been coaching at Auburn." (Doc. 62-2 at 260).

On August 10, 2015, Ghoiroaie's contract was again extended from August 1, 2015, until July 31, 2016.

On October 1, 2015, Spry held a staff meeting about recruiting and the allotment of scholarships to recruits. During the meeting, Ghioroaie and Richardson were involved in a heated argument regarding a recruit. According to Ghioroaie,

Rolle then started a verbal argument with Ghioroaie that turned physical. Richardson

reported this incident as follows:

> Coach Adrian Ghioroaie, in attempt to make a case for his recruit,
> began arguing for a full scholarship and Coach Spry let Adrian know
> that his recruit didn't meet the criteria for a full scholarship and
> suggested that my recruit was just as good and mentioned that I was not
> asking for a full scholarship. Adrian then began to lash out, first at me.
> I responded to Adrian and then he redirected his verbal assault to other
> members of the staff, criticizing the collective efforts of the staff in
> terms of work effort, coaching and recruiting.  Though there was no
> yelling up to this point, Adrian's tone was very aggressive.  This lasted
> maybe 5 minutes.  He then began to strongly criticize Henry Rolle.
> Adrian very aggressively went on to verbally attack[] Henry's
> coaching, recruiting, and character.  This lasted for about another 10
> minutes.

(Doc. 71-4).[3] Rolle reacted by grabbing Ghioroaie by the neck, which forced the

other coaches to restrain Rolle. Rolle then grabbed a tiger statue, lifting and waving

it as if he was going to strike Ghioroaie, and again, the other coaches had to restrain

Rolle.

Ghioroaie reported this incident to Bernard Hill, a Senior Associate Athletics

Director. Hill subsequently met with and requested written statements from each of

the witnesses present during the October 1 meeting. As a result of this incident, Rolle

was placed on administrative leave and suspended for two weeks. In addition, he

was denied the opportunity to receive a bonus at the end of the year, he was required

---

[3] Plaintiff filed this statement as an exhibit to his opposition to summary judgment
and relied on it throughout the opposition.  It is broadly consistent with his own
testimony about the incident.

to complete 25 hours of community service and a six-month anger management course, and he was not allowed to return to work until Ghioroaie reported that he felt comfortable with him doing so.

On October 8, 2015, Ghioroaie stopped by Spry's office to comment on Rolle's discipline. Spry claims that he tried to question Ghioroaie about his concerns with Rolle, and Ghioroaie ignored him and walked away. Spry further claims that he demanded that Ghioroaie return to his office and that Ghioroaie refused to respond and left the facility. Ghioroaie, however, claims that he never heard Spry's requests and, therefore, was not insubordinate.

After this incident, Ghioroaie was involved in a string of additional verbal confrontations over the next several months.

On October 30, 2015, Ghioroaie and Rolle were involved in a verbal confrontation after Rolle observed Ghioroaie and a group of recruits talking to a professional athlete who was training at the facility. That kind of communication could be an NCAA violation.

On November 3, 2015, Ghioroaie was involved in a disagreement with Spry regarding Spry's refusal to award one of Ghioroaie's recruits additional scholarship money and his general allocation of scholarships.

In December 2015, one of Ghioroaie's student-athletes expressed dissatisfaction about Ghioroaie to her high school club coach. Ghioroaie talked to

6

the club coach.  The club coach sent a text message to Spry about a "disturbing call" in which Ghioroaie "pretty much call[ed] [him] a liar." (Doc. 62-6 at 147). The club coach informed Spry that "in trying to talk to [Ghioroaie] I have decided that I would never send a jumper or a field event person his way." (Doc. 62-6 at 148).  "I'm sorry I had to send this text but the man is crazy." (Doc. 62-6 at 148).

On February 23, 2016, Ghioroaie and Rolle were involved in another confrontation, which involved a dispute about who could use an area on the track. Ghioroaie wrote a long, detailed email to human resources about the dispute.

On March 1, 2016, a student-athlete coached by Ghioroaie was transferred to a different coach after she became upset during practice.

On May 1, 2016, Spry and David Mines, a Senior Associate Athletics Director, met with Ghioroaie to inform him that his contract was not being renewed. At that meeting, Ghioroaie raised concerns that he was being discriminated against and also asked to say goodbye to the student-athletes on the track team. Plaintiff recorded the meeting, and the following is a small portion:

> Ghioroaie: I just want to give my group a hug and wish them all the best, man.

> Mines: Well, you know, sometimes that's great and sometimes it's just not a good thing.

> Spry: Well, again, Adrian, I'll be honest with you, now, I'm concerned because you're now talking about all this discrimination stuff and I don't know if I want you back with the team. I mean, I . . .

Ghioroaie: I'm not going to—I never brought any of that to the team, Coach.

Spry: Yeah, but you never know.

Ghioroaie: I never brought any of that to the team, man.

Spry: I'm just saying, the way you're talking now, I mean, now I'm . . .

Ghioroaie: Because I have to look at all the angles, Coach. I mean, I really do. It's a weird situation for . . .

Mines: And it's probably best to not have any kind of contact with . . .

Spry: Yeah. Why don't you write them a letter and I'll make sure they get it. That's what we'll do. And I'll address it tomorrow at the team meeting. I'm not going to go into any details. But inform the team of where we are.

(Doc. 62-5 at 30:00–32:00).

Because Ghioroaie's contract was set to expire on July 31, 2016, Auburn allowed him to use the remaining period of his contract to find a new job.

## II.   Ghioroaie's Complaints of Discrimination

According to Auburn, Ghioroaie first complained about race or national origin discrimination at the May 1, 2016 meeting when Spry informed him that his contract was not being renewed. But Ghioroaie claims that he made multiple complaints of race and national origin discrimination.

Ghioroaie claims that he complained of discrimination in writing on March 1, 2016, when he sent an email to Hill and Linda Maxwell-Evans, Executive Director

of the Human Resources Department, regarding the February 23 confrontation he had with Rolle on the track. Ghioroaie's three-page email described the incident and stated the following:

> I truly believe in us functioning as a team and helping each other. I always look at the bigger picture and direct my actions and energy for the benefit of the student-athletes that I am employed to serve. But I also believe that regardless of our nationality, skin color, accent, and other differences we have the right to do the work we have been employed to do in a safe environment.

(Doc. 62-2 at 286).

Ghioroaie also asserts without elaboration in a declaration that he verbally raised concerns about race and national origin discrimination. Ghioroaie says he raised these issues after the March 1 email in "subsequent meetings with Bernard Hill, Linda Maxwell-Evans, and Sonya Dixon, all HR personnel for Auburn." (Doc. 71-3, ¶ 13). Ghioroaie says that he also "discussed these concerns with Coach Spry when he met with me about the February 23, 2016 confrontation" between Ghioroaie and Rolle. (Doc. 71-3, ¶ 13).

## STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is

no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996). The Court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

## DISCUSSION

Plaintiff brings this action against Auburn, Spry, and Rolle. Both Spry and Auburn have moved for summary judgment on all claims against them, and thus the Court addresses those claims below.

## I.    Spry's Motion for Summary Judgment

Plaintiff asserts a negligent supervision and training claim against Spry in his individual capacity. Spry argues that he is entitled to summary judgment on this claim because (1) Alabama does not recognize a claim for negligent supervision and training against an employee, (2) Plaintiff's claim is time-barred, (3) Spry is immune from liability, and (4) Plaintiff has failed to meet his burden to show that a genuine dispute of material fact exists.[4] The Court need not address each of these arguments as Spry's first argument is dispositive.[5]

Whether a plaintiff may bring a claim against an employee for negligent supervision and training of a subordinate is not a novel question raised for the first time by the plaintiff in this case. Rather, it is a question that has been frequently and unanimously answered by federal courts in Alabama with a resounding "no." *See, e.g.*, *Hand v. Univ. of Ala. Bd. of Trustees*, 304 F. Supp. 3d 1173, 1182 (N.D. Ala. 2018) ("Alabama law does not recognize a cause of action against a supervisor for that supervisor's negligent training or supervision of a subordinate."); *Brannon v. Etowah Cnty. Court Referral Program, LLC*, 325 F.R.D 399, 427 (N.D. Ala. 2018) (finding that a supervisor "cannot be liable for negligent training or supervision

---

[4] On September 24, 2018, Spry moved for a judgment on the pleadings. (Doc. 47). In light of the Court's ruling on Spry's motion for summary judgment, that motion is due to be denied as moot.

[5] On March 6, 2019, Spry moved to amend his Answer to add a statute of limitations defense. (Doc. 56). Because of the Court's ruling on the underlying claim, that motion is due to be denied as moot.

because the ECCRP is the employer and not her"); *Doe v. City of Demopolis*, 799 F. Supp. 2d 1300, 1312 (S.D. Ala. 2011) (recognizing no negligent supervision or training claim against supervisor under Alabama law); *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314-15 (S.D. Ala. 2001) (same).

Plaintiff argues that other federal district court decisions are not binding on this Court and that a negligent supervision and training claim against an employee is a viable claim because it is "at its heart a negligence claim." But the Court finds persuasive the reasoning of the many other federal district courts that have addressed this issue. A negligent supervision and training claim is predicated on a master-servant relationship between the employer and the employee. *See, e.g.*, *Weissenbach v. Tuscaloosa Cnty. Sch. Sys.*, No. 7:17-cv-001642, 2018 WL 5848047, at *7 (N.D. Ala. Nov. 8, 2018) (holding that vice principals were also employees of the Board of Education and thus to the extent the plaintiff's negligence claims were "not based directly on [the vice principals' negligence], but instead, [were] based on claims of negligent supervision, those claims fail to state a claim"). And under Alabama law, an employee supervisor is not the "master" of his subordinate co-worker. *Ott*, 169 F. Supp. 2d at 1315. Rather, the master is "restricted to one who is actually or essentially the employer of the servant." *Id.*

Here, Plaintiff alleges that Spry was negligent in supervising Rolle, but it is undisputed that both Spry and Rolle were employed by Auburn. In other words, Spry

was not in a master-servant relationship with Rolle. Both he and Rolle were in a master-servant relationship with Auburn. Because Spry was not Rolle's employer, Spry cannot be held liable for the alleged negligent supervision and training of Rolle, and Spry's motion for summary judgment is due to be granted for that reason.

## II.   Auburn's Motion for Summary Judgment

Plaintiff asserts three claims against Auburn under Title VII: (1) race discrimination, (2) national origin discrimination, and (3) retaliation.

### A.  Title VII Discrimination Claims

Absent direct evidence, a claim for intentional discrimination is analyzed under the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335 (11th Cir. 2015). Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 1336. If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Flowers*, 803 F.3d at 1336. Once the employer meets its burden of production, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretext for unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

For purposes of summary judgment, Auburn concedes that Plaintiff has established a *prima facie* case of race or national origin discrimination. But Auburn argues that it has articulated multiple legitimate, non-discriminatory reasons for its decision not to renew Plaintiff's contract and that Plaintiff cannot show that its reasons are pretext for unlawful discrimination. The Court agrees.

To show pretext, a plaintiff must introduce substantial evidence both that the employer's articulated reason for the employment decision is false *and* that the real reason is unlawful discrimination. *Brooks v. Cnty. Cmm'n of Jefferson Cnty., Ala.*, 446 F. 3d 1160, 1162 (11th Cir. 2006). Plaintiff has shown neither. Plaintiff first attempts to demonstrate pretext by showing that Auburn offered inconsistent reasons for the non-renewal of his contract. Specifically, he claims that Auburn's failure to provide him with specific reasons for his non-renewal in the May 1, 2016 meeting demonstrates an inconsistency with Auburn's articulation of those specific reasons now. But to create an inference of pretext based on an employer's inconsistent reasons, "the new reasons relied on in litigation must plainly contradict the reasons relied on at the time of the decision." *Pate v. Chilton Ctny. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1133-34 (M.D. Ala. 2012); *see Thomas v. Dolgencorp, LLC*, 30 F. Supp. 3d 1340, 1351 (M.D. Ala. 2014) (finding that alternative reasons asserted by employer did not create inference of pretext).

Here, Auburn's reasons for non-renewing Plaintiff's contract have not changed. In fact, Auburn's reasoning has been wholly consistent from the time the decision was made until now: Plaintiff was not a good fit for the track team. The specific examples and reasons articulated by Auburn throughout this litigation *explain* its reasoning—they do not contradict it. *See Davis v. City of Lake City, Fla.*, 553 F. App'x 881, 886-87 (11th Cir. 2014) (holding that the city's "description of [plaintiff's] shortcomings forming the basis of his termination [were] all variations on the same non-retaliatory theme" and that its reasons were "wholly consistent" and "merely further elaboration of a general reason for [plaintiff's] termination").

Plaintiff next attempts to show pretext by claiming that he did not engage in some of the misconduct alleged by Auburn—that it was a misunderstanding—or that his actions were not serious enough to justify his non-renewal. For example, Plaintiff does not deny that he committed NCAA violations or that he was involved in a verbal altercation with an SEC official. He merely disagrees with Auburn regarding the seriousness of those incidents. *See* Doc. 71 at 22. But the Eleventh Circuit has long held that, to establish pretext, a plaintiff "must do more than criticize the business judgment of his employer" and "quarrel with the wisdom of the decision." *Knight v. Fla. Dep't of Transp.*, 291 F. App'x 955, 959 (11th Cir. 2008) (citing *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Thus, Plaintiff's subjective opinion about the seriousness of his actions does not create an inference of pretext.

Further, although Plaintiff claims he has presented evidence "effectively rebutt[ing]" the October 8, 2015 insubordination incident, his argument is unavailing. This incident was only one of many that led Auburn to conclude that Plaintiff was not a good fit for the track team. And when the employer proffers more than one legitimate, non-discriminatory reason, the plaintiff must "meet [each] reason head on and rebut it" to survive a motion for summary judgment. *Chapman*, 229 F.3d at 1030; *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). Moreover, Plaintiff's testimony says nothing about whether Spry honestly considered his failure to respond to his requests on October 8 to be insubordinate. *See Winborn v. Supreme Beverage Co. Inc.*, 572 F. App'x 672, 674 (11th Cir. 2014) (recognizing that employer is required to have an honest belief—not a correct one— that the employee engaged in misconduct). Plaintiff testified that he did not hear Spry's requests, not that Spry did not make them.

Finally, Plaintiff erroneously argues that the following evidence creates an inference of unlawful discrimination: (1) vague allegations that Spry treated two other white coaches unfairly and (2) comments made by Spry and Rolle referencing Plaintiff's national origin. These are insufficient to create a genuine dispute of fact.

As an initial matter, Plaintiff's threadbare allegations regarding Spry's unfair treatment of two other white coaches fall short for the same reasons his own

allegations of mistreatment fall short—there is no evidence in the record that any such treatment was based on the coaches' race or national origin.

Likewise, the supposed comments that Spry made about Plaintiff's national origin are insufficient to create a genuine issue of fact. Many of the comments do not evidence a discriminatory intent at all, such as "you do not understand certain things because of where you are from" or "it's not like where you are from." *See generally Ekokotu v. Fed. Exp. Corp.*, 523 F. App'x 629, 632 (11th Cir. 2013) (finding no invidious intent behind manager's remarks that he had difficulty understanding plaintiff because of his fast speech and accent). Plaintiff's brief argues that he was "often referred to by Spry and Rolle as 'Gypsy'" (Doc. 71 at 24), but this argument is no better. During his deposition, Plaintiff testified that Spry "cracked a joke here and there about . . . being from Romania." (Doc. 63-2 at 215:7-21). But when asked to identify the specifics regarding Spry's comments, Plaintiff stated that he could not remember when any such comments were made or even what the comments were. Further, Plaintiff testified generally that some people used the phrase "hey, gypsy" to refer to him. (Doc. 63-2 at 214:10-11). But Plaintiff conceded in his deposition that he was not offended by the phrase at the time. (Doc. 63-2 at

214:16-215:6). Without more, Plaintiff has presented insufficient evidence to infer discriminatory intent. [6]

Federal anti-discrimination law prevents discrimination; it does not require co-workers to get along. *See Woodruff v. Jackson Hosp. & Clinic, Inc.*, No. 2:18-cv-514, 2019 WL 5616906, at *5 (M.D. Ala. Oct. 30, 2019) (finding no substantial evidence that plaintiff was being harassed because of her race where plaintiff was "essentially complaining about workplace antipathy demonstrated by co-workers who happen to be African-Americans"). Here, Spry consistently renewed Plaintiff's contract until Plaintiff engaged in a series of intense disputes with a fellow coach and a club coach reported to Spry that Plaintiff was "crazy." At most, Plaintiff has presented evidence that Rolle mistreated him and that Spry showed favoritism to Rolle. But to be actionable under federal law, mistreatment and favoritism must be based on a protected characteristic—in this case, race or national origin. *See, e.g.*,

---

[6] The law requires that comments like these—even if generally inappropriate—be considered in the context of Plaintiff's employment as a college track coach, not as a laborer or office worker. The Supreme Court has explained that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). And other courts have taken note of "the informal, sometimes jocular, college sports team atmosphere that fosters familiarity and close relationships between coaches and players." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 698 (4th Cir. 2007) (en banc); *see also United States v. Marks*, 2013 WL 4502319, at *4 (S.D. Fla. Mar. 5, 2013) (recognizing that use of the term "gypsy" does not inherently evidence discriminatory intent but may create an inference of discrimination when used as part of an ethnic stereotype).

*Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir. 1990) ("A racially discriminatory motive cannot, as a matter of law, be invariably inferred from favoritism shown on the basis of some family relationship."); *Vickery v. Medtronic, Inc.*, 997 F. Supp. 2d 1244, 1255 (S.D. Ala. 2014) (holding that evidence "that a manager treated employees unfairly and showed slight favoritism toward others" did not create a "convincing mosaic" of unlawful discrimination). And that is where Plaintiff's evidence is lacking. There is no substantial evidence suggesting that Spry or Rolle had antipathy toward white people or Romanians. Instead, Plaintiff concedes that Spry and Rolle had a preexisting relationship that likely explained why Spry took Rolle's side. *See Duncan v. Jefferson Cnty. Bd. of Educ.*, No. 05-PWG-0442-S, 2006 WL 8436717, at *5 (N.D. Ala. Mar. 17, 2006) (holding that favoritism based on previous work relationship, not race, is insufficient to support § 1983 claim).  For these reasons, Plaintiff's discrimination claims based on race or national origin fail, and summary judgment is due to be granted.

   B. Title VII Retaliation Claim

   Like Plaintiff's discrimination claims, Plaintiff's retaliation claim is analyzed under the *McDonnell-Douglas* framework. To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is some causal connection between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361,

1364 (11th Cir. 2007); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

Auburn first argues that Plaintiff cannot establish a *prima facie* case of retaliation because Plaintiff did not complain of race or national origin discrimination prior to May 1, 2016, when he learned that his contract was not being renewed. Plaintiff claims that he complained of race or national origin discrimination in his March 1, 2016 email to Hill and Maxwell-Evans. But as Auburn points out, Plaintiff's March 1 email contains nothing more than a complaint about another confrontation he had with Rolle on the track, not a complaint about race or national origin discrimination. Though Plaintiff's three-page email includes one reference to his belief that all employees should be entitled to work in a safe environment "regardless of our nationality, skin color, accent, and other differences," this passing reference to protected characteristics is not enough to constitute protected activity for purposes of his retaliation claim. *See Ingram v. Sec'y of the Army*, No. 6:16-cv-150, 2017 WL 4574607, at *12 (M.D. Fla. Oct. 13, 2017), *aff'd*, 743 F. App'x 914 (11th Cir. 2018) ("The Eleventh Circuit has held that, at a minimum, protected activity requires a plaintiff to communicate his belief to his employer that discrimination is occurring."). By making this reference, Plaintiff in no way communicated to Auburn that he was the subject of race or national origin discrimination or that he believed his treatment by Rolle or Spry was due to a

protected characteristic. In fact, Plaintiff stated in the same email that he believed Spry favored Rolle "because of their history together." (Doc. 62-2 at 286).

But even though Plaintiff did not engage in protected activity in his March 1, 2016 email, Plaintiff also asserts in his declaration that he verbally complained of race or national origin discrimination in conversations with Spry, Hill, Maxwell-Evans, and Dixon in relation to the February 23 confrontation between himself and Rolle. It is Plaintiff's obligation to submit substantial evidence in support of his *prima facie* case of retaliation, but he has failed to identify when he made these alleged verbal statements or what he allegedly said to anyone. The only information in the record is Plaintiff's vague and conclusory assertion in his declaration that he had discussions about discrimination and these witnesses' sworn statements that Plaintiff never made any such complaint. Plaintiff's declaration does not create a genuine issue of material fact. *See King Corp. v. E-Z Eating*, 572 F.3d 1306, 1315, 1316 n.12 (11th Cir. 2009) (upholding district court's grant of summary judgment because the party's "vague" affidavits provided "scant evidence ... too scant to create a genuine [dispute]," where affidavits failed to state "when exactly the meeting was, where it was held, who specifically attended, what the attendees said, or what sort of information was exchanged"); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."); *Wilborn v. Kraft Foods*

*Grp., Inc.*, 71 F. Supp. 3d 927, 934-35 (W.D. Wis. 2014) (citations omitted) (noting a "declaration in opposition to a motion for summary judgment must set forth specific facts, not mere conclusions," especially since the "point of the evidentiary requirements in Rule 56 is to require the non-moving party to go beyond the conclusory allegations of the complaint, not simply recast those conclusory allegations in the form of a declaration," and finding that plaintiff "cannot evade [defendant's] documented refutation of [plaintiff's] evidence with a vague declaration that does not provide any specific details or cite any documentary evidence").

Auburn next argues that, even if Plaintiff engaged in protected activity, Plaintiff's *prima facie* case fails because he cannot show a causal connection between any alleged complaints of discrimination and the non-renewal of his contract. To establish a causal connection, Plaintiff must show that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse employment actions were not wholly unrelated." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006)). Temporal proximity alone may be enough to show that the protected activity and adverse employment

actions were not "wholly unrelated," but the temporal proximity must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Plaintiff's main argument on this front is that he presented direct evidence of retaliation based on statements Spry made at the May 1 nonrenewal meeting. But a review of the record of that meeting establishes that Plaintiff is wrong. After Plaintiff was informed that his contract was not being renewed, he complained about discrimination. Plaintiff also asked to say goodbye to the team. Spry said that Plaintiff would not be allowed to say goodbye in-person to his student-athletes because of his complaint, which he made "now" in the meeting. Nothing about this conversation indicates that Plaintiff was terminated because he made a discrimination complaint.

Nevertheless, even if Plaintiff had established a *prima facie* case for retaliation, Plaintiff's retaliation claim still suffers from the same flaw as his discrimination claims: there is no substantial evidence rebutting Auburn's explanation for the non-renewal of his contract from which a jury could conclude that Auburn's reasons were pretext for retaliation. For these reasons, Plaintiff's retaliation claim fails.

## CONCLUSION

Based on the foregoing reasons, the Court orders as follows:

1. Spry's Motion for Judgment on the Pleadings (Doc. 47) is **DENIED AS MOOT**.

2. Spry's Motion for Leave to Amend Answer (Doc. 56) is **DENIED AS MOOT**.

3. Auburn's Motion for Summary Judgment (Doc. 62) and Spry's Motion for Summary Judgment (Doc. 63) are due to be, and hereby are, **GRANTED**.

4. Rolle did not move for summary judgment, and Plaintiff's state-law claims against him remain pending. The parties **SHALL** address the following at the already-scheduled pretrial conference: (1) whether the Court has jurisdiction over Plaintiff's assault and battery claims under 18 U.S.C. § 1332 and/or 18 U.S.C. § 1367, and (2) whether a final judgment should be entered consistent with this order under Federal Rule of Civil Procedure 54(b).

5. This case is not closed.

**DONE** and **ORDERED** this 10th day of January 2020.

　　　　　／s/ Andrew L. Brasher　　　　　
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE